**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **BURAK AYDIN,** ) | Civil Action No. |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **COMPLAINT** |
| ) | |
| **UBER TECHNOLOGIES, INC.,** ) | |
| ) | **JURY TRIAL DEMANDED** |
| **Defendant.** ) | |
| ) | **NON-ARBITRATION** |
| ) | |

## PRELIMINARY STATEMENT

1. This is an action for damages brought by an individual, Burak Aydin, against Defendant Uber Technologies, Inc. ("Uber") for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq*., the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), the California Unfair Competition Law, and common law tortious interference with economic gain.

## JURISDICTION AND VENUE

2. Jurisdiction of this Court over Plaintiff's federal law claim arises under 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

3. Jurisdiction of this Court over Plaintiff's state law claims arise under 28 U.S.C. § 1332(a).

4. Venue lies properly in this district pursuant to 28 U.S.C. § 1391(b).

## PARTIES

5. Plaintiff Burak Aydin is an adult individual who, at all relevant times, resided in Philadelphia, Pennsylvania.

6.      Defendant Uber is a business entity that regularly conducts business in the Eastern District of Pennsylvania, and which has its headquarters and a principal place of business located at 1725 3rd Street, San Francisco, CA 94158.

## FACTUAL ALLEGATIONS

7.      In or around April 2024, Plaintiff had been employed with Defendant and had passed an initial background check when he began employment.

8.      Plaintiff was a driver for Defendant, and drove users of Defendant's platform as passengers.

9.      Defendant maintains certain standards with respect to an employee's driving record and criminal history that must be kept in order for an employee to remain employed.

10.     In order to verify that its employees continue to meet its standards, Defendant contracts with various third-party background check companies to run background checks on employees.

11.     On a regular periodic basis, Defendant requests updated background reports on its drivers from those background check companies.

12.     In or around April 2024, Defendant requested one of these background reports on Plaintiff from Checkr, Inc. ("Checkr").

13.     Checkr provided the background report on Plaintiff to Defendant in or around April 2024 (the "First Report").

14.     The First Report contained inaccuracies caused by Checkr mixing the Plaintiff's file with that of another consumer (hereinafter the "inaccurate information").

2

15.     In or around April 2024, Plaintiff received notice that Checkr had reported that inaccurate information to Defendant, and that he would be suspended from his employment with Defendant.

16.     Plaintiff was able to obtain a corrected report from Checkr in or around June 2024 (the "Second Report").

17.     The Second Report was provided to and was accessible by Defendant.

18.     Despite receipt of the Second Report, along with proof that Plaintiff met Defendant's employment standards, Defendant did not lift Plaintiff's suspension.

19.     In response, over the subsequent months, Plaintiff disputed his suspension multiple times with Defendant.

20.     In response to each dispute, Defendant falsely stated that there was still an issue with Plaintiff's background report from Checkr.

21.     In response to each dispute, Defendant directed Plaintiff to dispute the contents of the background report with Checkr despite the fact that Checkr had already corrected the report.

22.     In response to each dispute, Defendant refused to reinstate Plaintiff onto its platform.

23.     Upon information and belief, Defendant based its decisions to suspend Plaintiff and to not reinstate Plaintiff on the contents of the First Report.

24.     Defendant's responses to Plaintiff informed Plaintiff that he could dispute his Checkr report and correct any inaccuracies by contacting Checkr. However, the suspension is in fact due to Defendant's error in processing Plaintiff's updated background report, and therefore Plaintiff was not given a legitimate means to dispute the information that supposedly disqualifies him from Defendant's platform.

3

25.     Though Plaintiff had his report corrected by Checkr, as he was told to do by Defendant, his account with Defendant remained suspended, because Defendant had not provided Plaintiff with a legitimate means to dispute his report.

26.     Plaintiff was informed by Defendant that the sole basis for his suspension was the information on Plaintiff's Checkr consumer report, which Plaintiff disputed as inaccurate.

27.     Defendant has maintained its suspension of Plaintiff up through the date of this filing.

28.     By suspending Plaintiff's ability to use its platform, Defendant prevented Plaintiff from entering into hundreds of lucrative financial contracts and agreements with passengers.

29.     As a result of Defendant suspending Plaintiff, Plaintiff has lost the opportunity to drive for hundreds of third-party passengers.

30.     As a result of Defendant suspending Plaintiff, Plaintiff has lost significant wages.

31.     As a result of Defendant suspending Plaintiff, Plaintiff has experienced significant actual damages in the form of denied employment opportunities, financial damages, and emotional distress including embarrassment, stress, humiliation and anxiety.

32.     At all times pertinent hereto, Defendant was acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

33.     At all times pertinent hereto, the conduct of the Defendant, as well as that of its agents, servants and/or employees, was willful, reckless, negligent, and in grossly negligent disregard for federal and state laws and the rights of the Plaintiff herein.

## COUNT I
### FAIR CREDIT REPORTING ACT ("FCRA")

34. Plaintiff incorporates the foregoing paragraph as though the same were set forth at length herein.

35. At all times pertinent hereto, Uber was a "person" as that term is defined by 15 U.S.C. § 1681a(b).

36. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

37. At all times pertinent hereto, the above-mentioned First Report and Second Report prepared by Checkr were each a "consumer report" as that term is defined by 15 U.S.C. § 1681a(d).

38. Pursuant to its usual policies and practices, Uber never provided Plaintiff with adequate pre-adverse action notice before taking adverse action against him.

39. This practice violates one of the most fundamental protections afforded to employees and potential employees under the FCRA, and also runs counter to longstanding regulatory guidance. The Federal Trade Commission ("FTC") has long held that Section 604(b)(3)(a) [15 U.S.C. § 1681b(b)(3)(A)] "requires that all employers who use consumer reports provide a copy of the report to the affected consumer before any adverse action is taken. Employers must comply with this provision even where the information contained in the report (such as a criminal record) would automatically disqualify the individual from employment or lead to an adverse employment action. Indeed, this is precisely the situation where it is important that the consumer be informed of the negative information in case the report is inaccurate or incomplete." *See* Federal Trade Commission letter dated June 9, 1998 to A. Michael Rosen, Esq.

40. A primary reason that Congress required that a person intending to take an adverse action based on information in a consumer report provide the report to the consumer before taking

the adverse action is so the consumer has time to review the report and dispute information that may be inaccurate, or discuss the report with the prospective employer before adverse action is taken. *See* Federal Trade Commission letter dated December 18, 1997 to Harold R. Hawkey, Esq. ("[T]he clear purpose of the provision is to allow consumers to discuss reports with employers or otherwise respond before adverse action is taken").

41.     Consistent with that purpose, federal courts have held that the prospective employer must provide the report to the consumer "a sufficient amount of time before it takes adverse action so that the consumer may rectify any inaccuracies in the report." *Williams v. Telespectrum, Inc.*, 2006 U.S. Dist. LEXIS 101162, at *18 (E.D. Va. Nov. 7, 2006); *Beverly v. Wal-Mart Stores, Inc.*, 2008 U.S. Dist. LEXIS 2266 (E.D. Va. Jan. 11, 2008) (quoting *Williams*). In *Reardon v. Closetmaid Corporation*, 2011 U.S. Dist. LEXIS 45373 (W.D. Pa. April 27, 2011), the court certified a class action for prospective employees who did not receive a copy of their credit report at least five days before being notified that the employer might take adverse action.

42.     By means of these cases and others construing § 1681b(b)(3)(A), Uber had substantial notice that its conduct violated the FCRA.

43.     Uber negligently and willfully failed to comply with the requirements of 15 U.S.C. § 1681b(b)(3) by failing to provide Plaintiff with any meaningful way to correct the inaccurate information that Uber was supposedly relying on for its decision to suspend Plaintiff's account: Uber's pre-adverse action letter did not provide Plaintiff a legitimate means to argue that he was being suspended as the result of inaccurate information on his background report.

44.     Pursuant to 15 U.S.C. §§ 1681n and 1681o, Uber is liable to Plaintiff for willfully and negligently violating 15 U.S.C. § 1681b(b)(3).

**COUNT II**
**PENNSYLVANIA UNFAIR TRADE PRACTICES AND**
**CONSUMER PROTECTION LAW ("UTPCPL")**

45.     Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

46.     Uber is a "person" as that term is defined by 73 Pa. Stat. § 201-2(2).

47.     Plaintiff is a "person" as that term is used in 73 Pa. Stat. § 201-2(2).

48.     As detailed above, Uber engaged in "unfair or deceptive acts and practices" as that term is defined by 73 Pa. Stat. § 201-2(4).

49.     Uber, by its acts or omissions described herein, made materially false, misleading oral or written statements or other representations, directly and indirectly through authorized agents and employees, including but not limited to the following:

      a.  Falsely representing to Plaintiff that he was ineligible to drive using Uber's platform; and

      b.  Falsely representing to Plaintiff that his ineligibility to drive on Uber's platform was based on information provided by Checkr.

50.     Uber's acts and omissions detailed herein violate 73 Pa. Stat. § 201-3(a).

51.     Plaintiff suffered an ascertainable loss of money by the conduct of Uber as described herein.

52.     As a business entity, Uber knew or should have known prior to entering into a relationship with Plaintiff the laws governing that relationship.

53.     The routine business practices of Uber, subject to this claim, disregarded the laws governing its relationship with Plaintiff.

7

54.     No reasonable person would assume that an institution like Uber would violate the laws governing its activities.

55.     Plaintiff justifiably relied on Uber's acts and omissions by believing that it would lift Plaintiff's suspension upon receiving a corrected report from Checkr, and he continued to follow Uber's directions and instructions as further evidence of that reasonable reliance.

56.     As a result, Plaintiff has suffered significant harm, including financial, actual, and compensatory harm, along with the ascertainable loss described above.

57.     As a result of the above violations of the UTPCPL, Plaintiff has suffered ascertainable losses entitling Plaintiff to an award of statutory and actual damages, and attorney's fees and costs.

## COUNT III
## CALIFORNIA UNFAIR COMPETITION LAW

58.     Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

59.     Uber's decision to use a third-party identification software on its employees was a "business act or practice" as that term is used by Cal. Bus. & Prof. Code § 17200.

60.     Uber's decision to terminate or suspend drivers based on its own processing of background reports generated by third-party identification software is a "business act or practice" as that term is used by Cal. Bus. & Prof. Code § 17200.

61.     Uber's decision to not investigate its own systems to verify a driver's eligibility to continue employment pursuant to Uber's policies and procedures is a "business act or practice" as that term is used by Cal. Bus. & Prof. Code § 17200.

62.     Uber's decision to terminate and suspend Plaintiff from his ability to accept passengers was a "business act or practice" as that term is used by Cal. Bus. & Prof. Code § 17200.

63.    As detailed herein, the business acts and practices engaged in by Uber that resulted in Plaintiff being suspended and terminated are unlawful, unfair, fraudulent, and in violation of the California Unfair Competition Law.

64.    As a result of Uber engaging in the unfair and unlawful acts and practices, Plaintiff suffered significant economic and non-economic harm, including, but not limited to, lost wages, embarrassment, stress and anxiety.

## COUNT IV
## TORTIOUS INTERFERENCE WITH ECONOMIC GAIN

65.    Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

66.    Employee drivers with Uber are provided access to an "app" that allows prospective passengers to engage drivers.

67.    The prospective passenger requests a driver through the app, and the employee driver is given notice of the passenger's request along with an indication as to the expected revenue of driving that passenger to their destination.

68.    The employee driver is then given the opportunity to accept or not accept the passenger's request.

69.    When Uber terminated Plaintiff's employment, it suspended his use of the "app."

70.    As a result, since the suspension in April 2024, Plaintiff has lost out on hundreds of prospective passenger requests for rides.

71.    Plaintiff has lost out on the income from those rides.

72.    From April 2024 through to the present, there existed hundreds of economically advantageous relationships between Plaintiff and the third-party passengers.

9

73. Uber intentionally interfered with those relationships by suspending Plaintiff from use of the app.

74. The action was specifically taken by Uber to prevent Plaintiff from accepting any additional passenger requests.

75. Uber had no basis to suspend Plaintiff from use of the app.

76. As detailed above, Uber had no privilege or justification for interfering with Plaintiff's ability to accept passenger requests.

77. As a result of Uber's intentional interference, Plaintiff lost out on significant income from April 2024 up through the date of this filing.

## JURY TRIAL DEMAND

78. Plaintiff demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff seeks judgment in Plaintiff's favor and damages against the Defendant, based on the following requested relief:

(a)    Actual damages;

(b)    Statutory damages;

(c)    Treble damages;

(d)    Punitive damages;

(e)    Costs and reasonable attorney's fees; and

(f)    Such other and further relief as may be necessary, just, and proper.

Respectfully Submitted,

**FRANCIS MAILMAN SOUMILAS, PC**

BY:    _/s/ Joseph L. Gentilcore_
Mark D. Mailman, Esquire
Joseph L. Gentilcore, Esquire
William J, Cooper, Esquire
1600 Market Street, Suite 2510
Philadelphia, PA 19103
T: (215) 735-8600
F: (215) 940-8000
mmailman@consumerlawfirm.com
jgentilcore@consumerlawfirm.com
wcooper@consumerlawfirm.com

_Attorneys for Plaintiff_

Dated: March 31, 2026